1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                  NORTHERN DISTRICT OF CALIFORNIA

7

8   KEVIN ANTONIO WILLIAMS,                No. C 05-2870 MHP (pr)

9              Petitioner,                 **ORDER DENYING PETITION FOR**
                                           **WRIT OF HABEAS CORPUS**
10       v.

11  TOM CAREY, warden,

12             Respondent.
                                      /
13

14                          **INTRODUCTION**

15          Kevin Antonio Williams, a prisoner at the California State Prison - Solano, filed this

16  pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now

17  before the court for consideration of the merits of the habeas petition.  For the reasons

18  discussed below, the petition will be denied.

19                          **BACKGROUND**

20          The facts of the crimes that led to the conviction challenged here generally are not

21  relevant to Williams' habeas claims and therefore are summarized only very briefly:

22  Williams lived with Jane Doe from mid-October 1996 until April 30, 1999.  During the

23  course of living together, there were numerous incidents of violence, including Williams

24  hitting Jane Doe in the face.  On April 30, 1999, Jane Doe obtained a temporary restraining

25  order requiring Williams to move out and stay away from her.  Williams was arrested on

26  May 3 and 6, 1999 for violating the TRO.  Williams broke into Jane Doe's apartment in the

27  early morning of May 21, 1999.  "Over a period of several hours he threatened her with a

28  knife, stabbed her thigh, pulled her hair, and dragged her into the bedroom where he raped

**United States District Court**
For the Northern District of California

1   her.  He eventually surrendered to the police, who had been called by the neighbors."  People

2   v. Williams, 2003 WL 21437620 (hereinafter, "Cal. Ct. App. Opinion"), p. *1.

3       A jury trial was held in 2000 in Santa Clara County Superior Court.  The jury found

4   Williams guilty of first degree burglary, assault, two counts of false imprisonment by

5   violence, forcible rape, trespass by threat, two counts of violation of a court order, and

6   inflicting corporal injury on a cohabitant.  The court found that Williams had suffered one

7   prior prison term.  On July 25, 2000, Williams was sentenced to 15 years to life in prison.

8   The sentence was imposed for the forcible rape conviction; all other terms were set to run

9   concurrent to that 15-to-life term.

10      Williams appealed.  The California Court of Appeal affirmed the conviction and the

11  California Supreme Court denied the petition for review in 2003.

12      After his unsuccessful efforts on direct appeal and in state habeas proceedings,

13  Williams filed this action seeking a writ of habeas corpus.  This court determined that the

14  allegations of federal constitutional violations were cognizable in a federal habeas action and

15  ordered respondent to show cause why the writ should not be granted.  Respondent filed an

16  answer.  Petitioner did not file a traverse and the deadline by which to do so has long passed.

17  The matter is now ready for a determination on the merits of the petition.

**JURISDICTION AND VENUE**

18

19      This court has subject matter jurisdiction over this habeas action for relief under 28

20  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

21  conviction occurred in Contra Costa County, California, within this judicial district.  28

22  U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

23

24      Prisoners in state custody who wish to challenge collaterally in federal habeas

25  proceedings either the fact or length of their confinement are required first to exhaust state

26  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

27  highest state court available with a fair opportunity to rule on the merits of each and every

28  claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not

**United States District Court**
For the Northern District of California

dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

A.    The Transcripts On Appeal

Williams contends his rights to due process and equal protection were denied when the appellate court refused to order the preparation of transcripts of six pretrial proceedings.

United States District Court
For the Northern District of California

He requested transcripts of proceedings on July 14, 1999, September 7, 1999, September 13, 1999, October 21, 1999, January 13, 2000, and January 14, 2000. When he originally moved to augment the record with these transcripts, the California Court of Appeal granted the motion, although neither the motion nor the order granting the motion are included in the materials now before this court so this court cannot see the asserted grounds for the request or why and to what extent the request was granted. In any event, after about a year had passed, the state appellate court issued another order stating that it had received further information about the transcripts and determined that there had been substantial compliance with its earlier order. The state appellate court recounted the topics covered at the first five proceedings based on the clerk's minutes and determined that the first five proceedings were "not matters routinely reported and have no demonstrable bearing on potential issues on appeal." Resp. Exh. I, Feb. 25, 2002 Order, p. 2. As to the January 14, 2000 proceeding, the court stated that "[f]urther attempts to obtain a transcript or settled statement of the sixth proceeding of January 14, 2000 are unnecessary because its substance is sufficiently recapitulated in a transcribed proceeding." Id. at 2. Specifically, "the February 18, 2000 Marsden hearing, a transcript of which is in the appellate record and available to appellant, contains a thorough synopsis by defense counsel of the January 14 proceedings at which the People's motion to amend the information was granted." Id. Williams unsuccessfully sought relief by petitioning the California Supreme Court to issue a writ compelling the appellate court to order the transcripts of the six non-transcribed proceedings.

When it eventually decided the merits of his appeal, the California Court of Appeal rejected Williams' claim that the failure to provide the transcripts of those six pretrial proceedings denied him equal protection and due process. The California Court of Appeal explained that under both the federal constitution and state law, a criminal defendant has a right to an appellate record that permits meaningful review but Williams had not demonstrated that the absence of any of the six non-transcribed proceedings was prejudicial to his "ability to urge his Faretta [v. California, 422 U.S. 806 (1975)] claim, or any other claimed error." Cal. Ct. App. Opinion, p. *3. The proceedings of five of those dates were

not routinely transcribed because they were ministerial and the sixth hearing – the only "proceeding possibly germane to his Faretta claim" – had been recapitulated in a later transcribed hearing that was included in the appellate record. Id. Also, "clerks have a duty to prepare a record of the events during a court session, and their minutes presumptively contain accurate, descriptive and nondiscretionary information. [Citations.] Given this obligation, the absence of any reference in the minutes of the six nontranscribed proceedings to discussions of disputed issues of self-representation refutes the possibility that Faretta matters critical to meaningful review of appellant's claim of error were heard at those proceedings." Id.

If state law permits a direct appeal of a criminal conviction, due process and equal protection require that indigent criminal defendants be provided with free transcripts or other effective means for use in obtaining adequate and effective appellate review. See Britt v. North Carolina, 404 U.S. 226, 227 (1971); Griffin v. Illinois, 351 U.S. 12, 18-20 (1956) (per curiam). The court need only provide an indigent defendant with "a record of sufficient completeness" to prepare an appeal; irrelevant or extraneous portions of the transcript may be omitted. Mayer v. City of Chicago, 404 U.S. 189, 194-95 (1971). It does not violate clearly established federal law to require an indigent appellant to show a specific need for the transcripts requested. See Boyd v. Newland, 467 F.3d 1139, 1151 (9th Cir. 2006), cert. denied, 127 S. Ct. 2249 (2007); United States v. MacCollom, 426 U.S. 317, 322-23 (1976) (plurality opinion).

Williams has failed to show that there was something in the missing transcripts that was necessary for an effective appeal, i.e., that the failure to provide transcripts for the six identified proceedings adversely affected his appeal. Other than to urge that the transcripts might shed light on the scope of appointment of counsel contemplated by the court after Williams requested appointment of counsel or advisory counsel or whether Williams understood and desired the same, he does not identify what was in the transcripts not prepared. See Petition appendix, pp. 5-6. As discussed in section "B" below, the trial court did hold a hearing on the request for appointment of counsel or advisory counsel, and that

United States District Court
For the Northern District of California

October 18, 1999 hearing was transcribed.  The transcript of the October 18 hearing does not have any indication that it was a continued hearing or that there had been any earlier discussion of the substance of the request for counsel.  It would be uncommon for a court to address one motion on several different days without making any mention of earlier proceedings or why a further hearing was necessary.   The distinction between letting appellate counsel go on a fishing expedition to find claims as opposed to developing evidence known or believed in good faith to exist in support of a claim is important.  If all that was needed was an assertion that the fishing expedition should be allowed because something helpful might be found, all requests would have to be granted.  A would-be appellant need only make out a colorable need for a complete transcript, see Mayer, 404 U.S. at 195, but Williams did not even meet that low threshold with his assertion that the transcripts might have information relevant to his Faretta claim in light of the court minutes showing that Faretta matters were not covered at the proceedings and the absence of any statement by him that he believes a pertinent discussion existed in the record.  See CT 158, 209, 212,[1] 257, 276,[2] 277.  Cf. Boyd v. Newland, 467 F.3d at 1150-51 (petitioner showed a colorable need for entire voir dire transcript to effectively present Batson claim on appeal because comparative juror analysis was an important tool for such a claim).  Williams does not dispute the California Court of Appeal's determination that the minutes are presumed correct, and that those minutes for each of the first five non-transcribed proceedings did not mention any Faretta-related issues being addressed on the merits.

As to the January 14, 2000 proceeding, Williams has presented nothing to rebut the California Court of Appeal's determination that the transcript of the February 18, 2000 hearing contained a sufficient recapitulation of the non-transcribed January 14, 2000 proceeding.  As to the January 14 proceeding, a colorable claim may have been made out as to the necessity for a record of it to pursue a Faretta claim on appeal, but that only meant that the burden shifted to the State "to show that only a portion of the transcript or an 'alternative' will suffice for an effective appeal on those grounds." Mayer, 404 U.S. at 195.  That burden was satisfied when the California Court of Appeal determined that the recap of the substance

1  of the January 14, 2000 proceeding found in the February 18, 2000 transcript sufficed for

2  effective appeal on the <u>Faretta</u> claim.    <u>See, e.g.</u>, <u>Britt v. North Carolina</u>, 404 U.S. 226 (read-

3  back of notes was an adequate alternative to providing a complete transcript for retrial where

4  both trials took place in a small town before the same judge, with the same counsel and the

5  same court reporter who would have read back his notes to defense counsel upon request).

6       That the preparation of the transcripts was sought to enable appellate counsel to fish

7  for possible claims was evident from his representations in state court.  Appellate counsel

8  wrote that preparation of the transcripts "is the only meaningful way" appellate counsel "can

9  effectively and properly determine whether those proceedings may disclose any matters that

10 may be presented in support of his appeal to this Court." Resp. Exh. I, Appellant's Motion

11 To Augment Record And To Vacate Briefing Schedule, p. 1; <u>see also</u> <u>id.</u> at 2 (there is a

12 "likelihood that these additional portions of the record may well provide further information

13 on potential issues for presentation to this Court or that they may identify new issues for

14 evaluation.  Without the requested transcripts the undersigned counsel is unable to ascertain

15 whether there may be a viable issue disclosed by a record of those proceedings.") Where, as

16 here, the record that does exist – i.e., clerk's minutes – indicates that nothing happened in the

17 non-transcribed proceedings with regard to <u>Faretta</u> and <u>Marsden</u>[3] matters other than the

18 ministerial tasks of setting the dates on which the hearings on such motions would occur, it

19 cannot be said that the failure to provide the full transcript of the proceedings violated

20 Williams' rights to equal protection or due process with regard to his appeal.

21 B.    <u>Faretta Revocation Claim</u>

22      Williams claims that the trial court improperly revoked his <u>Faretta</u> status.  After his

23 <u>Faretta</u> motion had been granted and Williams was allowed to represent himself, he requested

24 that advisory counsel or a new attorney be appointed for him.  He faults the trial court for

25 appointing a new attorney without first obtaining a knowing and intelligent waiver of his

26 right to self-representation.

27      The California Court of Appeal rejected this claim, concluding that Williams could

28 not complain because he asked for assistance of counsel after he had been allowed to

represent himself.   The state appellate court explained that a failure to object to an order revoking pro se status at trial waives the right to challenge that order on appeal and that the Sixth Amendment is not violated when the defendant acquiesces in the assignment or participation of counsel.  "Here, not only did appellant never object to the revocation of his pro se status, he actively sought the assignment of counsel before it was revoked.  He sent a letter to Judge Minney, who was initially assigned to hear his trial, in which he specifically requested a new attorney or advisory counsel, given the seriousness of his case and his lack of legal knowledge."  Cal. Ct. App. Opinion, p. *6.  In addition to his written request, Williams also responded in the affirmative both times the judge orally asked him at the hearing on his request whether he wanted counsel.  Id.  "On this record, appellant cannot complain that the court denied him his right to self-representation."  Id.

A criminal defendant has a constitutional right to represent himself.  See Faretta, 422 U.S. at 818-19.  Self-representation is not the norm so the decision to represent oneself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay, see id. at 835; United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994); Adams v. Carroll, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989).  Requiring an unequivocal request ensures that the defendant does not inadvertently waive his right to counsel and prevents him from taking advantage of the mutual exclusivity of the rights to counsel and self-representation.  See Adams, 875 F.2d at 1444.  If a defendant equivocates, he is presumed to have requested the assistance of counsel.  See id.; see also United States v. Bennett, 539 F.2d 45, 51 (10th Cir.), cert. denied, 429 U.S. 925 (1976) (defendant who vacillated between representation by counsel and self-representation until 6 days before trial forfeited right to self-representation); United States v. Oakey, 853 F.2d 551, 552-54 (7th Cir. 1988), cert. denied, 488 U.S. 1033 (1989) (defendant's request for self-representation with co-counsel found equivocal because no right to such "hybrid" representation; request to proceed pro se properly denied).

The right of self-representation has a disfavored status because it results in a "concomitant forfeiture of the important benefits offered by the right to counsel."  Sandoval

1    v. Calderon, 241 F.3d 765, 774 (9th Cir.), cert. denied, 534 U.S. 847 and 943 (2001).

2    "[T]here is no rule that a defendant who has once expressed a desire for self-representation

3    must be cautioned or addressed personally before receiving the assistance of counsel."  Id.

4    The reason for the colloquy before the defendant starts representing himself is to enable the

5    court "advise the defendant of the numerous benefits of counsel and attendant pitfalls of self-

6    representation."  Id.  Not only is a colloquy not required before a defendant is allowed to

7    waive his Faretta right, it is undesirable because it might put the court in the undesirable

8    situation of suggesting to the criminal defendant that he would benefit from self-

9    representation.  Sandoval, 241 F.3d at 774 (defendant need not be questioned personally

10   before denial of Faretta motion where he had moved to represent himself but his attorney

11   later told the court that defendant would be satisfied with library privileges instead of self-

12   representation).

13        There was no Faretta violation in Williams' case.  Williams was allowed to represent

14   himself starting on about September 1, 1999, after a series of Marsden motions had been

15   denied.  On or about September 12, 1999, Williams filed a written motion for advisory

16   counsel.  See CT 210.  When he had not received a hearing or ruling on that motion,

17   Williams sent the court a letter on September 28, 1999, in which he asked for appointment of

18   advisory counsel or a new attorney.  CT 229 ("being that my case is so serious, also my lack

19   of knowledge of law, I am having a very difficult time going pro per.  I was forced to go pro

20   per because of my attorney and me not seeing eye to eye.  So I am asking you to please grant

21   me a new attorney or advisory counsel.")  The court set the matter for hearing on October 18,

22   1999, and had attorney Kelly from the alternate defender's office present as a potential

23   lawyer for Williams.  As often occurs, the Marsden and Faretta issues became intertwined

24   and the focus of the discussion at the October 18 hearing became Williams' dissatisfaction

25   with attorney Kelly, rather than how much help he would receive if a lawyer was appointed.

26   The court asked Williams whether he wanted to represent himself or to have an attorney and

27   did not offer a third option of standby counsel.  Williams stated that he did want an attorney.

28   RT 110.  Williams also voiced extreme doubts about his ability to represent himself as he

complained about the representation he had received from attorney Kelly.  <u>See</u> CT 210; RT

106 (when attorney Kelly had suggested Williams could actually "handle this case by myself,

I know he was pulling my leg, setting me up with the D.A. to lose"); RT 107 ("I want

somebody who will take it serious and do some investigating.")   Although Williams now

suggests there is some ambiguity as to whether the court was appointing counsel to represent

him or only to act as advisory counsel, the transcript indicates that the trial court saw two

options (i.e., self-representation or representation by counsel), and not a third option of

advisory counsel.  RT 104, 110.

    Comments at a hearing several months later confirm that Williams did in fact want an

attorney to represent him, as long as it was not attorney Kelly.  At the February 18, 2000

<u>Marsden</u> hearing about attorney Coker who had been appointed to represent him, Williams

eventually conceded that he did not actually want to discharge Coker but just wanted more

attention paid to his case.  <u>See</u> 2/18/00 RT 120 ("Well, anyway, I don't want to want to get

rid of Mr. Coker."); RT 125 ("Well, tell you the truth, I really – I don't really want to get rid

of Mr. Coker," and just want to be able to trust and have confidence in the attorney); RT 126

("Well, what I really wanted was just time to sit down and get us a defense" because he was

feeling neglected by counsel).  Although the decision to appoint counsel had been made by

the court long before the February 18, 2000 hearing occurred and that hearing was to

determine whether the appointed counsel should be ousted, the hearing transcript sheds light

on the situation.  The transcript reveals that Williams was becoming increasingly alarmed as

his predicament worsened – as had happened when the plea offer had been taken off the table

and the charging document was amended to increase the charges against him – and was

taking out his frustrations on the attorneys who attempted to represent him.  Attorney Coker

thought Williams was a difficult client to communicate with because Williams didn't know

the law and became frustrated with counsel when the law was not as Williams wished it to

be.  RT 134-135.  Coker explained that he had not spent a lot of time with his client because

they had agreed that Williams would not be testifying, and Coker was devoting his efforts to

preparing a defense through other sources.  The court explained that his attorney couldn't be

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

blamed for the fact that Williams' prison exposure had increased and there was not a favorable plea deal available, that attorney Coker appeared to be working with Williams and preparing a case with a viable defense theory, and that it appeared that while Williams was "very unhappy about the present posture for disposition, but that you're really not anxious to relieve Mr. Coker, you've said that more than once."  RT 138-139.  Williams agreed: "Yeah, I just – I want more time for us to sit down" to talk about the defense.  RT 139.

Williams was allowed to represent himself, as required by <u>Faretta</u>.  He then had a change of heart, asked for counsel and received it.  <u>Faretta</u> gave him no right to advisory counsel, so once he started requesting counsel, his commitment to self-representation was reasonably viewed as being equivocal.  The court was not required to inquire further whether Williams understood what he was giving up when Williams asked for representation by counsel after he realized that self-representation wasn't working out for him.   The unique nature of the <u>Faretta</u> right – it being exercisable only at the expense of a separate right and it being generally thought of as an unwise choice – allows courts to resolve any doubts when a defendant equivocates in favor of representation by counsel.  The California Court of Appeal's rejection of Williams' claim was not contrary to or an unreasonable application of clearly established federal law as set forth by the U.S. Supreme Court.

C.      <u>Hybrid Representation/ Ineffective Assistance Of Counsel</u>

Williams contends that he received ineffective assistance of counsel because the court permitted a de facto hybrid representation by him and his counsel.  He contends the trial court did not advise him of the scope of Coker's duties when it appointed Coker as his attorney.  Williams contends that it was ambiguous whether Coker was appointed as advisory counsel or as the only counsel for the defense.  Williams contends further that this "engendered a hybrid co-mingling of defense [philosophy] marked by a series of interjections to the court by petitioner."  Petition appendix, p. 8.  Williams blames his own involvement and interjections during trial on the failure of the trial court and his attorney to prevent the situation by failing to stop him and failing to educate him to the dangers he was creating for himself.

The California Court of Appeal rejected the claim that there was a de facto hybrid representation.  The court explained that California cases had made some references to hybrid representation and co-counsel, but that "there are only two basic categories of representation, with permissible variations: professional counsel or self-representation.  Cal. Ct. App. Opinion, p. *6.  There cannot be two captains to the defense ship under state law: "the defendant or the attorney must be in charge, and the record should always be clear that the defendant either represents himself or is represented by an attorney."  Id. (citations omitted).  The court concluded that there was not a hybrid representation here and that Williams was represented by counsel.  Id.  "The instances of direct dialogue between the court and appellant cited by appellant cannot plausibly be construed as transforming him from a defendant represented by professional counsel into a participating co[-]counsel."  Id. at *7.  With the possible exception of Williams' comments at the motion for new trial hearing, the record did not show Williams' conduct to "constitute, or even resemble, core functions of an attorney at trial, such as planning overall strategy, making objections, or examining witnesses."  Id.

1.    Williams' Interjections At Trial

Williams provided citations to several places in the record where he spoke.  See Appellant's Opening Brief, pp. 5-6:

He spoke during voir dire outside the presence of prospective jurors, telling the court he thought a prospective juror was African-American.  See RT 464-467.  From the transcript, it appears that Williams initially just blurted out his opinion without invitation from defense counsel or the court; thereafter, when he tried to speak again, the court stated: "I'll let you speak.  I'll give you a little leeway as long [as] you are not in front of the jury.  I don't want you blurting stuff out."  RT 465.

During discussions about scheduling of witnesses and jury instructions, Williams interrupted and said that he "would like to know the kind of question she . . . what she can bring up about my past."  RT 859-860.  His attorney then stated that the prosecutor could use four of his felony convictions and the court added that it was still considering the "11352,"

apparently referring to a drug conviction under California Health & Safety Code § 11352. RT 860.   This exchange took place outside the jury's presence.

During a proceeding outside the jury's presence when there was a discussion of the admissibility of a nurse's testimony, Williams interrupted and complained that he had not been allowed his "right" to attend the jury instruction discussion.  RT 1345-1346.  The court explained that his attorney had waived his presence at the jury instruction discussion.  RT 1346.  During further questioning of the nurse outside the presence of the jury, Williams once again interrupted without invitation.  See RT 1368-1370.  First he complained that he didn't have a chance to talk to his attorney and blamed the court for denying him that access. RT 1368.  The court told defense counsel to sit next to his client, apparently to allow attorney and client to converse.  Moments later, Williams interrupted again, apparently to disagree with the witness.  RT 1370.  He told the court that it couldn't have a trial without him, apparently trying to generate a mistrial or reversible error.  The court told Williams that he only would be allowed to "remain in the courtroom if you don't keep talking like this."  RT 1370.  Williams challenged the court to remove him from the courtroom, rather than agreeing to be quiet.  RT 1370.  Williams appeared adamant that he could speak to protect his rights because he was the one on trial.  See RT 1371.

Although Williams cites RT 1455 and 1458 as examples of him speaking in court, neither page has any statement by him.  When the court and counsel were discussing scheduling matters at the end of a trial day, defense counsel Coker mentioned to the court that Williams was upset that Coker had waived his presence for the jury instruction conference.  RT 1455.  The court responded that Williams had no right to be at the conference.   The court also noted that he had been concerned about the defendant's behavior and had expected that he might have to remove Williams, but Williams had maintained his composure.  RT 1458.

On another date during trial, Williams tried to talk to the judge, but the judge refused to let him because the jury had just been brought into the courtroom.  RT 1473.  Several minutes later after the witness had finished and the jury had left the courtroom, the court let

13

United States District Court
For the Northern District of California

Williams speak. RT 1478. Williams complained that he had not until that day seen the phone records that had been subpoenaed long before trial. RT 1478-1479. The court responded that the disclosure of the telephone records was unrelated to the defense counsel's examination of the witness. RT 1479. When Williams complained that he had been told the telephone records could not be opened except in court, the court stated "that's the law," and defense counsel observed, "[m]y client has never believed me on any issue of the law." RT 1480. Williams' comments suggest he was trying to find out whether his attorney had erred in not getting the records opened earlier in court. RT 1480.

Williams cites RT 1571 as showing his further interruption of the court proceedings, but there is no statement from him on that page of the transcript. On that page, the court states that it would go through the instructions that would be given so that "Williams knows exactly what we spent about eight hours talking about." RT 1571.

The court also responded to Williams' concern that the jury had been present while he was absent due to illness at the jail. RT 1702-1703. The judge explained that he had only told the jury that there was an unavoidable delay and they couldn't go forward at that time. RT 1703. The court denied that instructions were read to the jury in Williams' absence. RT 1703.

The court also responded to Williams' inquiry as why the jury could not have written transcript of a taped conversation. RT 1722-1723. Defense counsel also argued that the jury should be allowed access to the transcript, but the court refused to allow it. RT 1722.

As the court was directing the jurors to begin deliberations, Williams interrupted in a rather obvious attempt to get the jurors to focus on the penalty he faced. RT 1896. He stated, "Your Honor, I'm facing 25 to life. I think this ought to go in with them. How can I –" at which point the court interrupted him, told him to stop talking and told the jurors to disregard whatever he had said. RT 1896-1897. This was the only statement Williams identified that was made while the jury was present.

During a discussion between court and counsel regarding the evidence that would be admissible to prove Williams' prior convictions, he said, "I did two years on the '85." RT

14

1    1946.  Defense counsel moved to strike, and the court told Williams that he did not need to

2    speak.

3           Long after the verdict came in, a motion for new trial was filed.  At the motion for

4    new trial, defense counsel argued several grounds in his motion and then noted that he and

5    his client were at odds on a particular ground for a motion for new trial, i.e., that a new trial

6    should be granted because there had been a mid-trial delay.  RT 1960; CT 527-528, 531.  The

7    court entertained the part of the motion for new trial that had been handwritten by Williams

8    (i.e., that the mid-trial delay warranted a new trial), allowed Williams to argue the point, and

9    then rejected it.  RT 1960-1962.  (Williams had previously complained about the interruption

10   of trial for the judge's vacation.  See RT 1700.)

11          2.    Analysis

12          Williams' federal claim fails on the law as well as the facts.  It fails on the law because

13   he has not identified any Supreme Court authority prohibiting hybrid representation, even if

14   it had occurred.  Although there is clearly established law from the Court that a criminal

15   defendant has a right to be represented by counsel, Gideon v. Wainwright, 372 U.S. 335

16   (1963), and a right to represent himself, Faretta, 422 U.S. at 832, the Court has not found

17   hybrid representation unconstitutional.  Of course, the defendant has no constitutional right

18   to hybrid representation, see United States v. Kienenberger, 13 F.3d 1354, 1356 (9th Cir.

19   1994), but to say he has no constitutional right to it is not to say that the constitution prohibits

20   it.  As a result, Williams cannot meet the requirement in 28 U.S.C. § 2254(d) of showing that

21   the California Court of Appeal's rejection of his claim that he was in an impermissible hybrid

22   representation situation was contrary to or an unreasonable application of any Supreme Court

23   precedent.  His argument in state court, and the state court's analysis of it, turned on state

24   authorities, not U.S. Supreme Court cases.

25          The claim also fails on the facts in that there was no hybrid representation Williams

26   was not the co-captain of the defense ship.  This court has examined the citations to the

27   record provided by Williams and agrees with the state appellate court's assessment that, with

28   the possible exception of the motion for new trial, Williams' interruptions did not rise to the

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

level of a hybrid representation situation.   As to the motion for new trial, Williams was allowed to present an argument that his attorney had chosen to forego, i.e., that the mid-trial interruption had denied him a fair trial, but he has not shown how he was prejudiced by being allowed to argue his ground for a new trial.  For the most part, the pages Williams cited have the common thread that he just blurted out things and had not been invited to speak.  Often what he blurted out was not related to what was being discussed by others on the record. And all but one of the comments was made outside the presence of the jury, and the one comment made in the presence of the jury drew a quick admonition from the judge.  Short of gagging Williams, it isn't clear how his conduct could have been stopped.  Most of his commentary that he complains about occurred after the court told him not to blurt things out, RT 465, and threatened to remove him from the court if he continued to interrupt, RT 1370, and his attorney told him not to "play lawyer," RT 305.  As the state court of appeal explained, "[e]ven on the cold appellate record, appellant manifests a headstrong, easily-frustrated personality.  When the court allowed appellant to make occasional comments and explained procedures to him, it adopted a sensible approach to diffuse potential volatility and conflict, which enabled the case to proceed more smoothly."  Cal. Ct. App. Opinion, p. *7. The state court reasonably concluded that, with the possible exception of the motion for new trial (as to which his participation was inconsequential), Williams' disruptions weren't the functional equivalent of lawyering and there was no hybrid representation.

3.    <u>No Ineffective Assistance of Counsel</u>

The California Court of Appeal rejected the claim that defense counsel was ineffective by failing to control his client:

> As the record readily demonstrates, particularly with regard to the numerous <u>Marsden</u> motions and the court's comments at the hearing on appellant's motion for new trial [footnote omitted], appellant had firm ideas as to how his case should be presented and resisted his attorney's advice and counsel.  His attorney could reasonably conclude that constant efforts to chastise appellant for speaking out would not only be futile but would likely exacerbate an already tense working relationship.  Furthermore, appellant has not shown that there is a reasonable probability he would have received a more favorable outcome had his attorney made more strenuous efforts to control his independent behavior, the bulk of which, as noted, took place outside the jury's presence.

16

1    Cal. Ct. App. Opinion, p. *7.

2        The Sixth Amendment right to counsel guarantees effective assistance of counsel.  See

3    Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim

4    of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the

5    adversarial process that the trial cannot be relied upon as having produced a just result.  Id.

6    A habeas petitioner must establish two things to prevail on a Sixth Amendment

7    ineffectiveness claim: (1)  that counsel's performance fell below an "objective standard of

8    reasonableness" under prevailing professional norms, Id. at 687-688; and (2) that he was

9    prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability

10   that, but for counsel's unprofessional errors, the result of the proceeding would have been

11   different." Id. at 694.  A difference of opinion as to trial tactics does not automatically

12   amount to ineffective assistance.  See Brodit v. Cambra, 350 F.3d 985, 994 (9th Cir. 2003),

13   cert. denied, 542 U.S. 925 (2004).

14       Williams has failed to identify any prejudice resulting from his attorney's failure to

15   control him and keep him quiet during trial.  His ineffectiveness claim fails on the prejudice

16   prong of the Strickland test.  All but one of Williams' comments occurred outside the

17   presence of the jury, and the one time he disrupted while the jury was in the courtroom, the

18   court quickly admonished him to stop and admonished the jury to ignore what he had said.

19   As to the motion for new trial, he hasn't shown how any harm resulted from allowing a client

20   argue an additional ground in a motion for new trial that counsel had determined was

21   inappropriate to include in his motion.  Counsel had no duty to include the ground he

22   perceived to be meritless in his motion for new trial and no prejudice resulted from not

23   including it.  See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (no ineffectiveness in

24   not filing meritless motion); cf. Smith v. Robbins, 528 U.S. 259, 263-65 (2000) (finding no

25   constitutional violation in the Wende brief practice in California under which counsel, upon

26   concluding that an appeal would be frivolous, files a brief with the appellate court that

27   summarizes the procedural and factual history of the case, and attests that he has reviewed

28   the record, explained his evaluation of the case to his client, provided the client with a copy

17

of the brief, and informed the client of his right to file a pro se supplemental brief).  Bearing in mind that the benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result, see Strickland, 466 U.S. at 686, it can be said with certainty that defense counsel's failure to insist that his client keep his mouth shut during the trial did not amount to ineffective assistance of counsel.  Williams is not entitled to the writ on this claim.

D.    Batson Procedure Claim

Williams asserts an interesting procedural claim about Batson v. Kentucky, 476 U.S. 79 (1988).[4]  He contends that, although the trial court denied his first objection to the peremptory strike of one juror for lack of a prima facie showing, the trial court was obliged to reconsider the striking of that juror when Williams later objected to the peremptory strike of a second juror as to which the court found that a prima facie case had been shown but, after hearing the prosecutor's explanation, determined that no discriminatory purpose existed for striking the second juror.

At Williams' trial, two panels of 60 prospective jurors each filled out a questionnaire. After excusing some jurors for hardship and cause, the trial court filled the jury box with 12 jurors and 12 alternates and did further voir dire of those 24 people.  The parties then alternated their peremptory challenges.

When the prosecutor used her second peremptory challenge to excuse Juror B., appellant, who is African American, made a Wheeler motion on the grounds that Juror B. was the only African American juror among the first 12 jurors called to the jury box, and there were no factors on his questionnaire that would normally cause a prosecutor to strike a juror.  The court denied the motion because appellant failed to make a prima facie showing that Juror B. was excused because of race.

The court then conducted voir dire of 12 more jurors, one of whom was Juror S., after which the parties again exercised peremptory challenges.  During this second round of peremptory challenges, the prosecutor used her third challenge to excuse Juror S.  Appellant made another Wheeler motion on the grounds Juror S. was the second African American to "enter into the jury box" and she "fit[] . . . the classical prosecution profile," so "we are starting to get to systematic exclusion where a hundred percent of the box have been excluded."  The court found a prima facie case of discrimination and asked the prosecutor to explain why she excused Juror S.  It accepted the prosecutor's explanation as race-neutral.  It refused appellant's requests that the prosecutor, having excused two African Americans, now be ordered to

1    explain why she had earlier excluded Juror B.

2    The final jury contained one African American and one African American alternate.  Of the potential jurors in the panel who were never called to the jury box, four were African Americans.

3    

4    Cal. Ct. App. Opinion, pp. *8-9.

5    The California Court of Appeal rejected Williams' contention "that once the court

6    found he had made a prima facie showing of group bias in his second Wheeler motion, it

7    erred in refusing to require the prosecutor to justify her peremptory challenge to Juror B., the

8    subject of his first Wheeler motion."  Cal. Ct. App. Opinion, p. *9.  The California Court of

9    Appeal correctly identified Batson as the key federal case on the equal protection claim, but

10   focused mostly on state court cases which are largely irrelevant to the federal habeas

11   analysis.  The state appellate court explained that, in the second Wheeler motion, Williams

12   had to show that Juror S was stricken solely due to her race.  The striking of Juror B was

13   necessary and relevant to the argument that a systematic pattern of race-based exclusion was

14   beginning to emerge.  "However, the prosecutor's task in rebutting the prima facie case was

15   to show that her peremptory challenge to the subject of the second Wheeler motion, i.e., to

16   Juror S., was based on race-neutral grounds.  Once she made a satisfactory showing that her

17   peremptory challenge of Juror S. was not race based, she negated any inference of a pattern

18   of exclusion based on race."  Cal. Ct. App. Opinion, p. *9.  There was no need to revisit the

19   peremptory challenge of Juror B since that had already been resolved.  Id.

20   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution

21   forbids peremptorily challenging potential jurors solely on account of their race.  See Batson,

22   476 U.S. at 89.  Batson permits prompt rulings on objections to peremptory challenges under

23   a three-step process.  First, the defendant must make a prima facie showing that the

24   prosecutor has exercised peremptory challenges on the basis of race.  See id. at 96-97.  That

25   is, the defendant must demonstrate that the facts and circumstances of the case "raise an

26   inference" that the prosecution has excluded venire members from the petit jury on account

27   of their race.  Id. at 96.  Second, if the requisite showing has been made, the burden shifts to

28   the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Id.

19

United States District Court
For the Northern District of California

at 97; see Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).  Finally, the trial court

must determine whether the defendant has carried his burden of proving purposeful

discrimination.  See Batson, 476 U.S. at 98.  In evaluating the race-neutral explanation, the

court must keep in mind that proof of discriminatory intent or purpose is required to show a

violation of the Equal Protection Clause.  See Hernandez v. New York, 500 U.S. 352, 355-62

(1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty

in accepting translator's rendition of Spanish language testimony); Purkett v. Elem, 514 U.S.

765, 768 (1995) (ultimate burden of persuasion regarding racial motivation rests with, and

never shifts from, the opponent of the strike).

     The problem for Williams is that his is a procedural claim and the Supreme Court has

left it to the states to come up with their own procedures for implementing Batson.  In

Batson, the Court stated:

> Nor are we persuaded by the State's suggestion that our holding will create serious administrative difficulties.  In those States applying a version of the evidentiary standard we recognize today, courts have not experienced serious administrative burdens, . . . and the peremptory challenge system has survived.  We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges.24/

>     [footnote 24:] In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today. . . .

Batson, 476 U.S. at 99-100 & n.24.  Two decades later, the Supreme Court continues to

recognize that States can use different procedures to implement Batson, so long as the right

standards from Batson are applied.  See Johnson v. California, 545 U.S. 162, 168 (2005)

("Although we recognize that States do have flexibility in formulating appropriate

procedures to comply with Batson, we conclude that California's 'more likely than not'

standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie

case."); cf. Ford v. Georgia, 498 U.S. 411, 423 (1991) (noting that the Court had recognized

in Batson "that local practices would indicate the proper deadlines in the context of the

various procedures used to try criminal cases, and [the Court] left it to the trial courts, with

their wide 'variety of jury selection practices,' to implement Batson in the first instance.")  In

short, the Supreme Court has never decided that the objections must be made and ruled upon as each questioned peremptory challenge is made, or after all the peremptory challenges have been made, or somewhere in between. There also is no Supreme Court authority that requires that, where <u>Batson</u> motions are made seriatim, the trial court must consider anew a peremptory challenge it has already found had satisfied <u>Batson</u>. And there is no Supreme Court authority that the <u>Batson</u> analysis must be made of the group members en masse. Given this, the state appellate court's rejection of Williams' claim cannot be said to be contrary to or an unreasonable application of, clearly established Supreme Court authority, as it must be to justify habeas relief under § 2254(d).

  The fact that Williams' challenges were made in two different motions makes the situation different from that which would exist if there had only been a single <u>Batson</u> motion as to Juror B and Juror S. Williams does not challenge the correctness of the trial court's ruling on the first <u>Batson</u> motion that there had not been a prima facie showing as to Juror B.[5] And he does not challenge the correctness of the trial court's determination that purposeful discrimination had not been shown as to Juror S. When the trial court ruled that Williams had failed to carry his burden of proving purposeful discrimination as to Juror S, there was then no more of a discriminatory pattern than when the court had earlier made its ruling that a prima facie case had not been made as to Juror B. This is not to say that the first peremptory challenge against someone in the protected group is always irrelevant; rather, where the court has determined that there was not a prima facie case made under <u>Batson</u> as to that first challenged juror, the trial court does not unreasonably apply <u>Batson</u> by not revisiting that determination when another <u>Batson</u> motion is made under the circumstances present here. Williams' counsel specifically argued that the trial court had to consider again the strike of Juror B when he made his second <u>Batson</u> motion, and the trial court specifically refused to do so. RT 387, 389. Defense counsel offered <u>no</u> new information about Juror B in his second <u>Batson</u> motion, notwithstanding that the trial court had denied his first motion for lack of a prima facie showing. The trial court's rejection of defendant's request apparently meant that that the trial court had rejected the "systematic exclusion" theory after one-half of

the alleged pattern had been explained to the court's satisfaction.  Although statistical analysis of a strike may change depending on when in the process the questioned strike occurs, see Wade v. Terhune, 202 F.3d at 1198, and that may counsel in favor of waiting until all peremptory challenges are exercised to do the Batson analysis, the Supreme Court has not commanded that such a procedure be followed by the trial courts.  Williams is not entitled to the writ on his claim that the trial court's Batson procedure was constitutionally impermissible.

E.    Sentence Imposed Under § 667.61.

        Williams challenges the sentence he received under California Penal Code § 667.61. He contends that the charging information alleged an enhancement under California Penal Code § 667.61(a) and not under § 667.61(b), and therefore he cannot be sentenced under the latter provision.   His petition identified only two federal authorities, Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004).  The heading in the petition identified this claim thusly: "petitioner was subjected to an increased penalty enhancement when the prosecutor created a separate 'substantive offense' pursuant to § 667.61(b) by combining factors not specifically pled in the information."  Petition, p. 13.  His is a technical argument and apparently works thusly:  he contends that § 667.61(a) is a separate substantive offense of a sex offense with multiple aggravating circumstances and the jury did not find true multiple circumstances (i.e., it found true that the sex offense was during a burglary, but did not find true the allegations of weapons use and great bodily injury); therefore, he reasons, the prosecution failed to prove each "element" of § 667.61(a) and he cannot be sentenced under the separate and uncharged provision in § 667.61(b) which allowed for a lesser sentence when only one aggravating circumstance was found true.

        The first amended information alleged in count 6 that Williams had committed rape. CT 284D.  The information also alleged several enhancements for the rape count, one of which is relevant to this claim.  The information alleged:

        DESIGNATED SEX CRIME WITH TWO OR MORE SPECIFIED
        CIRCUMSTANCES
        It is further alleged, pursuant to subdivisions (a) and (e) of Penal Code section 667.61,

United States District Court
For the Northern District of California

1  that in the commission of the above offense in count six, the Defendant, KEVIN
2  ANTONIO WILLIAMS, committed a burglary, as defined in Penal Code section
   460(a), personally inflicted great bodily injury on Jane Doe in violation of Penal Code
3  section 12022.7, and personally used a dangerous and deadly weapon in violation of
   Penal Code section 12022(b)(1).

4  CT 284G

5  California Penal Code § 667.61(a) provided that a person convicted of rape "under

6  one or more of the circumstances specified in subdivision (d) or under two or more of the

7  circumstances specified in subdivision (e) shall be punished by imprisonment in the state

8  prison for 25 years to life."   Section 667.61(b) provided that, except as provided in

9  subdivision (a), a person convicted of rape "under one of the circumstances specified in

10 subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life."

11 The eight circumstances listed in subdivision (e) include: a rape committed during the

12 commission of a burglary other than a first degree burglary listed in subdivision (d),[6] the

13 "defendant personally inflicted great bodily injury on the victim or another person in the

14 commission of the present offense in violation of Section 12022.53, 12022.7, or 12022.8,"

15 and the "defendant personally used a dangerous or deadly weapon or a firearm in the

16 commission of the present offense in violation of Section 12022, 12022.3, 12022.5, or

17 12022.53."  Cal. Penal Code § 667.61(e)(2, 3, 4).

18 The jury verdict found Williams guilty of forcible rape (count 6) and made these

19 further findings regarding the rape:

20 Having found defendant guilty of the crime of forcible rape, we the jury in the above
   entitled matter further find the defendant did not personally use a knife, a dangerous
21 and deadly weapon, during the commission of the crime of forcible rape.

22 Having found the defendant guilty of the crime of forcible rape, we the jury in the
   above entitled matter further find:
23
24 1) The defendant did commit the crime of forcible rape during the commission
   of first degree burglary.

25 2) the defendant did not personally inflict great bodily injury on Jane Doe in
   the commission of the crime of forcible rape.
26
27 3) The defendant did not personally use a dangerous and deadly weapon in the
   commission of the crime of forcible rape.

28 CT 491.

23

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by jury.  U.S. Const. amend. VI.  This right to a jury trial has been made applicable to state criminal proceedings via the Fourteenth Amendment.  <u>Duncan v. Louisiana</u>, 391 U.S. 145, 149-50 (1968).  <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), extended a defendant's right to trial by jury to the fact finding used to make enhanced sentencing determinations as well as the actual elements of the crime.  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  <u>Apprendi</u>, 530 U.S. at 488-90.  The "statutory maximum" for <u>Apprendi</u> purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings.  <u>Blakely v. Washington</u>, 542 U.S. 296, 303-04  (2004).

No <u>Apprendi</u> error occurred in Williams' case.  The jury found true that Williams "did commit the crime of forcible rape during the commission of the crime of first degree burglary."  CT 491.  The jury had been instructed that it needed to find the enhancement allegations true beyond a reasonable doubt.  <u>See</u> CT 410.  ("The People have the burden of proving the truth of this allegation.  If you have a reasonable doubt that it is true, you must find it not to be true.")   The instruction, like the verdict form, identified several allegations for the jury to find the defendant did or did not do, without any indication that multiple circumstances had to be found.  The 15-to-life sentence imposed on Williams was authorized by the jury's factual findings on the sentence enhancement allegation.

To the extent Williams is claiming that he did not receive adequate notice of the charge against him, the claim fares no better.  If § 667.61(a) was considered a "substantive offense" as he urges, then § 667.61(b) would be a lesser included offense of it:  subdivision (a) would be rape with multiple aggravating circumstances, and subdivision (b) would be rape with one aggravating circumstance – where both (a) and (b) involved the same list of

United States District Court

For the Northern District of California

1  aggravating circumstances.  When one is charged under a statute identifying a greater offense

2  and it necessarily encompasses another lesser-included offense, it sufficiently puts the

3  defendant on notice of the need to defend against both offenses.  See Gautt v. Lewis, 489

4  F.3d 993, 1007 (9th Cir. 2007); cf. id. at 999-1000 (notice not adequate where the uncharged

5  enhancement had a stiffer penalty and was based on different conduct).  The amended

6  information that provided notice of the greater "substantive offense" also provided notice of

7  the lesser-included offense.

8  Sentencing Williams to the 15-to-life sentence authorized by the jury's finding that

9  one of the aggravating circumstances was true did not violate Williams' federal constitutional

10  rights.   He is not entitled to the writ on this claim.

**CONCLUSION**

12  The petition for writ of habeas corpus is DENIED on the merits.  The clerk shall close

13  the file.

14  IT IS SO ORDERED.

15  DATED:   October 22, 2007

16  Marilyn Hall Patel
   United States District Judge

25

**NOTES**

1.      The September 13, 1999 minutes indicate that a motion for advisory counsel was filed by Williams, that a pretrial conference was set for October 18, and that there was a motion for advisory counsel set for hearing at that conference.  CT 212.  That the motion was set for a hearing on October 18 was confirmed by another document issued by the court.  See CT 254.

2.      The minutes for January 13, 2000, state that a Marsden hearing was set for January 14, 2000.  CT 276.

3.      People v. Marsden, 2 Cal. 3d 118 (1970), requires the trial court to permit a criminal defendant requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing.

4.      Several years before Batson was decided, the California Supreme Court decided  People v. Wheeler, 22 Cal. 3d 258, 280 (1978).  Under Wheeler, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion.  After Batson, these motions have been commonly referred to in California courts as Wheeler motions, Batson/Wheeler motions, or Batson motions.

5.      As respondent argued, the particular claim asserted by Williams does not turn on the standard used by the state court for determining whether a prima facie showing was made and does not involve the holding in Johnson v. California, 545 U.S. 162 (2005).

        Had this case required a Batson analysis be done by a reviewing court, it would have been impossible on the record.  Neither the appellate record nor the habeas record contain the questionnaires for Juror B or any other juror.  And defense counsel did not elaborate upon the traits of Juror B that he believed would have made him acceptable to the prosecutor but for Juror B's race.

6.      The verdict form showed that the jury found Williams guilty of burglary and found the burglary to be first degree.  CT 465.  However, the verdict was silent as to whether the burglary was done with the intent to commit rape and the jury instructions identified a different intent relative to the burglary, see CT 386.  The absence of a finding that the burglary was with the intent to commit rape meant that § 667.61(d)(4) did not apply, i.e., although the burglary was a first degree burglary, the rape was not committed "during the commission of a burglary of the first degree, as defined in subdivision (a) of Section 460, with intent to commit an offense specified in subdivision (c)."  Thus, the burglary by Williams came within the circumstance at § 667.61(e)(2).